## JOHN STEELEY v. STATE.

No. A-3277—Opinion Filed March 2, 1920.

(187 Pac. 821.)

(Syllabus.) ·

1. **ATTORNEY AND CLIENT—Indictment and Information—Disqualification of County Attorney to Present Information.** An attorney cannot represent conflicting interests or undertake to discharge inconsistent duties, and where an attorney appeared for the defendant on his preliminary in a prosecution for murder, and files a motion for continuance, and then waives a preliminary examination, he is disqualified as county attorney to sign and present an information in the case.

2. **WITNESSES—Disclosure by Defendant of Wife's Communications to Him.** Under section 5882, Rev. Laws 1910, providing that neither husband nor wife shall in any case be a witness against the other, and that neither "shall in any event on a criminal trial be permitted to disclose communications made by one to the other except on a trial of an offense committed by one against the other," the defendant, in a prosecution for killing his wife's paramour, is incompetent as a witness to disclose communications made by his wife to him.

3. **SAME—Disclosure by Third Person.** The statute which prohibits either the husband or wife from testifying to communications made by one to the other has no application to a third person or persons who may overhear communications between them, and such person or persons may testify to communications overheard by them between husband and wife.

4.  **HOMICIDE—Defenses of Insanity and Provocation—Evidence of Immoral Conduct of Deceased and Defendant's Wife.** Where there is evidence tending to show defendant's insanity just prior to and at the time of the commission of the homicide, it is competent for defendant to testify concerning statements and admissions made to him by deceased relative to deceased's immoral conduct with the wife of the defendant, and also of defendant's personal knowledge of such immoral conduct, as tending to show actuating causes of defendant's alleged insanity. It is also competent and admissible as tending to show provocation.

5.  **TRIAL—Homicide—Duty to Instruct on Degrees.** In a prosecution for murder, the court should submit the case to the jury for consideration upon every degree of homicide which the evidence in any reasonable view of it suggests; and, if the evidence tends to prove different degrees, the law of each degree which the evidence tends to prove should be submitted to the jury, whether it be requested on the part of the defendant or not.

*Appeal from District Court, Delaware County; John H. Pitchford, Judge.*

John Steeley was convicted of murder, and he appeals. Reversed, and cause remanded, with directions.

*E. B. Hunt, E. H. Beauchamp,* and *J. W. Miller,* for plaintiff in error.

*S. P. Freeling,* Atty. Gen., and *W. C. Hall,* Asst. Atty. Gen., for the State.

DOYLE, P. J. This appeal is from a judgment of conviction for murder; the punishment having been assessed at imprisonment for life at hard labor. The information charges that in Delaware county on the 18th day of April, 1917, John Steeley then and there did kill and murder one Tom Grider by shooting him with a shotgun and with a pistol. It is signed, "G. W. Goad, County Attorney."

The first assignment of error is that the court erred in overruling the defendant's motion to set aside the information.

It appears from the record that upon arraignment the defendant appeared in person and by his attorneys, E. B. Hunt and J. W. Miller, the state by G. W. Goad, county attorney, W. W. Hastings, and Williams & Williams, counsel assisting the county attorney. The following proceedings were had:

"Mr. Goad: If the court please, I never have had any connection with this case by employment or otherwise, but I acted as an accommodation for Mr. Hunt at the preliminary trial. Mr. Hunt was sick on that day and asked me to file an application for countinuance for him, for the reason that he was sick. I never have had any employment of any kind in the case; have never talked to the defendant about the case or ascertained the facts in the case. I filed the application for Mr. Hunt at the preliminary trial. I didn't appear as counsel for the defendant, and told the court at that time I didn't represent him, that I merely appeared for Mr. Hunt and presented his application for a continuance for the reason that Mr. Hunt was sick. I want to make that statement to the court and let the court see whether or not that will disqualify me.

"The Court: You were not representing him as counsel? A. No, sir.

"The Court: You had no arrangement about employment or about a fee? A. None whatever.

"The Court: No hope of any? A. No, sir.

"The Court: And what you did was purely an accommodation for Mr. Hunt? A. Yes, sir; as an accommodation for Mr. Hunt is all.

"The Court: That would not disqualify you. You may arraign the defendant."

Thereupon the county attorney, G. W. Goad, reads the information to the defendant:

"The Court: What do you say, guilty or not guilty?

"Mr. Hunt: If the court please, the defendant files a motion to set aside the information in this case on the following grounds: First, said information is not endorsed, presented, or signed as required by law, in this, that said purported information was not and is not signed, presented, endorsed, or exhibited by the county attorney or Attorney General or any one authorized by law to present informations in this state; second, that the defendant herein has not had a preliminary examination and has not waived the same, but is being prosecuted upon a purported information without having had a preliminary or waiving the same as required by law; that the defendant is being proceeded against without authority of law. Wherefore movant asks that the information be set aside."

To sustain the motion the defendant was sworn as a witness and testified:

"I was in custody of the officers, and they took me before Mr. Ingram, justice of the peace at Jay, and I took a change of venue, and the case was sent to J. L. Johnson, a justice of the peace near Sycamore. On the day the case was set for trial the officers took me before this justice. I had employed Mr. Hunt as my attorney, but he was not present. Mr. Goad was present, and told me Mr. Hunt was sick, and Mr. Goad prepared an affidavit for continuance on the ground that Mr. Hunt was my counsel and was unable to appear for me, and I signed it and was sworn by the justice. It was filed, and Mr. Goad made a talk, and the justice said it did not make any difference to him who was defending me, Woodrow Wilson, or who it was, the motion would be overruled. Mr. Goad then asked me what I was going to do about it, and I said I did not know what to do, and he said, 'I would just waive the preliminary.' I never said anything at all."

Cross-examination by Mr. Hastings:

"Q. Didn't you tell the justice of the peace you would waive it? A. No, sir.

"Q. Didn't Mr. Goad for you? A. Yes, sir; he told him that."

The duly certified transcript of the committing magistrate as filed in the office of the court clerk was then introduced, and is in part as follows:

. "On the 4th day of May, 1917, the case was called for trial, and the defendant appeared in person and by Attorney G. W. Goad. The state announced ready for trial, and defendant filed a motion for continuance on account of the absence of counsel, which was overruled by the court, whereupon the defendant then waived preliminary examination in the district court."

It is also stipulated, and the fact is admitted, that W. W. Miller, the legally elected and qualified county attorney, was at the time of the trial temporarily absent by reason of having been drafted into the army, and that the county commissioners in regular session found that fact and declared there was a vacancy in the office of county attorney, and thereupon appointed G. W. Goad as county attorney.

"The Court: The motion to set aside the information will be overruled. (To which ruling of the court the defendant excepts.)"

Counsel for the defendant in their brief say:

"Now, Mr. Goad either represented Steeley or he had no attorney, and if Mr. Goad did represent Steeley, which he did not, he certainly never waived preliminary examination."

In the Attorney General's brief it is stated:

"The court was wrong in assuming that Mr. Goad represented Mr. Hunt instead of the accused. Mr. Hunt was

not on trial. The court, however, we would think, was right in assuming that as a matter of law in this case Mr. Goad was not disqualified to appear on behalf of the state, for one reason at least, that the defendant, by failing to object, in law, released Mr. Goad from his obligation of attorney to client"

—citing among other cases *State v. Howard,* 118 Mo. 127, 24 S. W. 41, holding that:

"A conviction will not be reversed because an attorney assisted counsel for the prosecution, after having been appointed counsel for defendant at a previous term, where such attorney neither appeared nor prepared papers in the cause, did not advise with defendant as to its merits, and was excused from further service as counsel for defendant" —and concluding:

"Had the defendant interposed objections to Mr. Goad representing the state by reason of former representation of defendant, following what we think are the best precedents, it would have been reversible error for the court below to have overruled his objections."

We think that upon the record the objections made sufficiently raised the question, although no exception was reserved to the ruling of the court holding that Mr. Goad was qualified to file the information and prosecute the case as county attorney. This court has held that the office of county attorney is quasi judicial, and a county attorney is disqualified from becoming in any way entangled with private interests or grievances connected with the private practice of the law (*McGarrah v. State,* 10 Okla. Cr. 21, 133 Pac. 260) ; that a county attorney who, prior to his election and qualification as such, was counsel for a defendant in a criminal action then pending, is disqualified to appear and prosecute said defendant on behalf of the state (*Dodd v. State,* 5 Okla. Cr. 513, 115 Pac. 632) ; that an attorney

is employed in his professional capacity when he is voluntarily listening to a client's preliminary statement; that it is not necessary that any retainer should have been promised, paid, charged, or demanded; and that it makes no difference even though the services are gratuitous (*Evans v. State,* 5 Okla. Cr. 643, 115 Pac. 809, 34 L. R. A. [N. S.] 577).

In the case of *People v. Gerold,* 265 Ill. 448, 107 N. E. 165, Ann. Cas. 1916A, 636, it is said:

"So far as we are advised, this court has never been called upon in any criminal case to pass on a question similar to the one here involved, but the identical question has been passed upon many times in other jurisdictions, and in this and other courts the principle involved has received careful consideration. The rule has long been firmly established that an attorney cannot represent conflicting interests or undertake to discharge inconsistent duties. When he has once been retained and received the confidence of a client, he cannot enter the service of those whose interests are adverse to that of his client or take employment in matters so closely related to those of his client or former client as in effect to be a part thereof. Weeks on Attorneys (2d Ed.) §§ 120, 271; 1 Thornton on Attorneys, § 174. This rule is a rigid one, designed not alone to prevent the dishonest practitioner from fraudulent conduct, but as well to preclude the honest practitioner from putting himself in a position where he may be required to choose between conflicting duties. He should undertake no adverse employment, no matter how honest may be his motive and intentions. *Strong v. International Bldg., etc., Union,* 183 Ill. 97, 55 N. E. 675, 47 L. R. A. 792. He owes to his client fidelity, secrecy, diligence, and skill, and cannot take a reward from the other side. He is not, as a general rule, allowed to divulge information and secrets imparted to him by his client or acquired during their professional relation unless

authorized to do so by the client himself. *Hatch v. Fogerty,*
40 How. Prac. (N. Y.) 492. It is the glory of the legal
profession that its fidelity to its clients can be depended
upon; that a man may safely go to a lawyer and converse
with him upon his rights in litigation with absolute as-
surance that the lawyer's tongue is tied from ever dis-
cussing it. *U. S. v. Costen,* 38 Fed. 24. This rule has been
so strictly enforced that is has been held that an attorney,
on terminating his employment, cannot thereafter act as
counsel against his client in the same general matter, even
though while acting for his former client he acquired no
knowledge which could operate to the client's disadvantage
in the subsequent adverse employment. *Pierce v. Palmer,*
31 R. I. 432, Ann. Cas. 1912B, 181, 77 Atl. 201, and cases
cited in note. If this is the rule in civil cases, the law will
not be less strict in criminal proceedings, especially as to
the duty in this regard resting upon counsel for the state.
Such an officer is acting in a quasi judicial capacity, and
he and those associated with him should represent public
justice and stand indifferent as between the accused and
any private interest. It is as much the duty of prosecuting
attorneys to see that a person on trial is not deprived of
any of his statutory or legal rights as it is to prosecute
him for the crime with which he may be charged. *State
v. Osborne,* 54 Or. 289, 20 Ann. Cas. 627, 103 Pac. 62. The
canons of ethics of the American Bar Association and va-
rious state associations in this country are in accord on
this subject with the rule just stated. An attorney cannot
be permitted to assist in the prosecution in a criminal case
if by reason of his professional relations with the accused
he has acquired a knowledge of the facts upon which the
prosecution is predicated or which are closly interwoven
therewith. *Wilson v. State,* 16 Ind. 392; *Com. v. Gibbs,* 4
Gray (Mass.) 146. The members of the profession must
have the fullest confidence of their clients. If it may be
abused, the profession will suffer by the loss of the confi-
dence of the people. The good of the profession, as well
as the safety of clients, demands the recognition and en-

forcement of these rules. *State v. Halstead,* 73 Iowa, 376, 35 N. W. 457. It is unnecessary that the prosecuting attorney be guilty of an attempt to betray confidence; it is enough if it places him in a position which leaves him open to such charge; and this disqualification may arise by reason of services rendered by him in a civil case as well as in a criminal case. *State v. Rocker,* 130 Iowa, 239, 106 N. W. 645; 2 Thornton on Attorneys, §§ 693, 700. The administration of the law should be free from all temptation and suspicion, so far as human agencies are capable of accomplishing that object, and public policy strongly demands that one who has been employed on one side should not be permitted to appear on the other side. It is not sufficient to say that the law will not permit him to disclose any fact which may have been communicated to him. 'If he knows the vulnerable points in the case, * * * there are many ways by which these points might be made available * * * besides disclosing them as a witness.' *Gaulden v. State,* 11 Ga. 47. 'The case might easily be put that a most honest man so changing the situation might communicate a fact appearing to him to have no connection with the case,' and yet which might turn out to be the vital point therein. *Cholmodely v. Clinton,* 19 Ves. Jr. (Eng.) 261. The authorities last cited also state that, if an attorney knows anything prejudicial to a former client, he ought not to accept employment against him where such prejudicial information can be used against him. Of course, it is no ground for preventing counsel from accepting employment in a case merely that he has knowledge of the facts involved therein. *Com. v. King,* 8 Gray (Mass.) 501. It is the obtaining of this knowledge from his client as his confidential adviser and attorney that precludes him from accepting such employment.

" 'Lest any temptation should exist to violate professional confidence or to make any improper use of the information which an attorney has acquired confidentially, as well as upon principles of public policy, he will not be per-

mitted to be concerned on one side of the proceedings in which he was originally in a different interest, * * * and though discharged many years ago and feeling himself free to swear that he had forgotten the nature and purport of the communications he had received from the former client, and that they were not confidential, for the court cannot investigate the plus or the minus of the confidence reposed in him without an absolute disclosure of the facts, nor can it calculate how much of these confidential communications are still in the recollection of the attorney, but the mere circumstance of a retainer sufficiently implies the fact of confidential disclosure to whatever extent having been made.' I Ferguson's Ir. Pr. 36, 37; *In re Cowdery,* 69 Cal. 32, 10 Pac. 47, 58 Am. Rep. 545; *Hatch v. Fogerty, supra.*

"Considering only the affidavit and testimony of Attorney Webb himself, the conclusion is inevitable that he was employed by Gerold in a matter that was very closely interwoven with and related to the same subject-matter that formed a basis for this prosecution, if, indeed, it was not the same identical matter, and that this rule must be invoked against his employment in this cause. No matter if his intentions were of the best, he placed himself in a position to be open to the charge of betraying the professional confidence of his client. The law will not permit this. The trial court should have sustained the motion and refused to permit Webb to assist in the prosecution of this cause."

Here the undisputed facts are that the defendant had employed Mr. Hunt as his counsel. Mr. Hunt, being sick, requested Mr. Goad to appear for the defendant and file a motion for continuance on the ground of Mr. Hunt's sickness, which motion being overruled, Mr. Goad advised the defendant to waive preliminary examination, and in the presence of the defendant, and acting for him, Mr. Goad waived the preliminary examination.

Upon these facts we think that the relation of attorney and client existed between Mr. Goad and the defendant. The fact that Mr. Goad received no compensation from the defendant, and it does not appear that he obtained any information which might be prejudicial to the defendant, is, we think, immaterial.

Mr. Goad, having appeared for the defendant and represented him in the proceedings had upon the preliminary complaint, was disqualified to sign the information as county attorney, and is disqualified to act as prosecuting attorney in the prosecution of the defendant for the crime charged in the original complaint. Mr. Goad being disqualified, the trial court should have appointed some suitable person, as provided for in section 1558, Rev. Laws 1910.

It follows that the trial court erred in holding that Mr. Goad was not disqualified to act as prosecuting attorney in the prosecution of the defendant, and in overruling the motion to set aside the information.

In view of another trial we are asked to pass upon exceptions taken to the rulings of the court upon evidence offered and rejected. The theory of the prosecution was that the killing was an assassination. It appears that the defendant was born and had lived in that part of the Cherokee Nation all his life, and married the stepdaughter of deceased in 1912; that on the day of the tragedy the deceased, with Henry Rogers and John Rogers, left Leach in a Ford car and drove to Jay. Returning that evening, they stopped where a limb of a tree was laying across the road within two miles of Grider's home. When the car stopped the defendant stepped from the brush near the roadside and killed Grider with a double-barrel shotgun, firing both barrels, and then shot him with a pistol; death

was instantaneous. Insanity was the defense upon which the defendant sought an acquittal of the charge against him.

A number of witnesses testified to intimate acquaintance with the defendant for several years, and to acts, conduct, and declarations of the defendant during the two weeks intervening between the day of his mother's funeral and the day of the tragedy tending to show that he was not a person of sound mind, and giving as their opinion that the defendant during that time was not rational, and that he was insane.

Counsel for the defendant contend that the court erred in sustaining the state's objections to the evidence of the defendant as a witness on his own behalf. The record shows that the defendant offered to testify as follows:

"That about three months after he was married to Mame Steeley she told him that she had been false and untrue to him; that her stepfather, Tom Grider, was the father of her daughter, Florence, and not Mr. Fawcett, who was her former husband; that immediately thereafter they separated, and he went to Claremore and wrote a letter to Tom Grider, in which he stated that his wife had told him that he ruined her when she was only 14 years old, and that he (Grider) was the father of her child; that Grider answered the letter, and denied that he was the father of her child, and denied that he had ruined her, and asked him to come back and live with the girl who was his wife; that he did come back and attempted to live with the wife again, and about a week after his return from Claremore Grider said to him, 'I will have to admit what you said in the letter to be a fact, but that was a long time before you married Mame, and I think you ought to forgive me and her and go home and live with her, and I will give you my word of honor as a man that I will not molest you and her and

will not go about her any more with a view of having intercourse with her,' that, so far as he knew, Grider kept his promise for approximately two years, at the end of which time Grider got drunk, and he was called by Grider's wife to her home to protect her and the children and to quiet Grider; that night he and his wife slept upstairs, and after they had gone to bed the wife of Tom Grider came to the room where the defendant and his wife were in bed, and told his wife that Mr. Grider wanted to see her down stairs; that she went down stairs and came back crying and told him that Grider had taken hold of her and tried to pull her in the bed with him in the presence of her mother; that was in 1914 or 1915; the next morning he asked Grider about this matter and why he had broken his promise to him to let Mame alone, and Grider told him that he was drunk and for him not to pay any attention to it, that he would not do it any more, and Grider promised him that he would not bother her any more; that his wife induced him to move to Tar River, in Ottawa county, stating that she wanted to get away from where Grider was, and after they had moved to Tar River Grider came to Tar River and was with defendant's wife in his absence; that Grider returned three weeks afterwards and proposed that the defendant and his wife move back to Delaware county, and he (Grider) would have the Indian agent or the department at Muskogee remove the restrictions from his wife's lands, she being a restricted Cherokee Indian; that was in the fall of 1916 or the spring of 1917; that they moved back and were to trade this land for a store that Grider claimed to own at Leach; that after they returned Grider and the defendant's wife made a trip to Muskogee for the purpose, as he was told by Grider, of presenting the matter to the department; that when his wife returned from Muskogee she told him that, instead of consulting the department, they went to the New Katy Hotel in the city of Muskogee and registered under an assumed name and slept together that night, and that Grider compelled her on that

occasion to sleep with him and to have sexual intercourse with him; that was in the latter part of March or the first of April, 1917; that one night, in March, 1917, at a late hour, Tom Grider and the defendant's wife being away, he drove into the town of Leach in a car and went into the home of defendant, while he was at a neighbor's house, that he slipped up to a window and looked in, and they were sitting on the bed, and Grider had his arms around her; that the defendant heard Grider leave there that night; got his car about 1 or 2 o'clock; that three weeks prior to the time Grider was killed the defendant was fixing a fence for one of his neighbors, and rode in sooner than he had stated to his wife that he would be back, and got off his horse about 50 yards from the back door of the house and slipped up to the back door and suddenly opened the door, and saw Grider and his wife having sexual intercourse; that she was on the bed and Grider was on top of her; that he walked out to the barn and Grider came out, and he told Grider that he had again sought out his stepdaughter who had been trying to evade him, and that he had again broken his promise to the defendant to let her alone; Grider attempted to deny that they were doing anything wrong; he (defendant) told him he was telling a lie; that he had seen him this time with his own eyes; this was on Thursday; that he did not sleep with his wife, and took her to her mother's and left her there and went back to his home; that he went to Grider's house and talked to her, and in that conversation she told him again that Grider compelled her to have sexual intercourse with him, and had threatened to kill her and kill the defendant if he did not stay away from them and let them alone; that on Monday before Tom Grider was killed on Wednesday defendant again talked to Grider about his conduct with the defendant's wife; she was in town with Grider at that time and near the Leach post office; and when the defendant and Grider were talking and in that conversation Grider told the defendant he had had sexual intercourse with his (defendant's) wife,

saying, 'Now, John, by God, that is my woman, and I don't want you fooling around her any more; I want you to get your junk out of that house over there, and I intend to keep Mame and her things in that house;' that in this conversation Grider said that he was not going to let the defendant and Mame have this store as agreed upon, but that Mame and Mr. Beam were going to run the store, and for the defendant to keep away from the store and keep away from the house he was living in; that in this conversation they talked about Grider's conduct at the graveside of the defendant's mother, in which he (defendant), in his presence, asked Mame to get in the buggy and go home with the defendant, as she had been staying up at Grider's, and defendant's wife laid her hands on his shoulder and said, 'I love you, John, but I can't live with you, for that old son of a bitch of a stepdaddy of mine, he won't let me live with you; we could get along if you could keep him off of me.''

The testimony proposed to be given by the defendant as to statements made to him by his wife relative to her relations with deceased as above set forth was incompetent and inadmissible under the provisions of section 5882, Rev. Laws 1910, which provides as follows:

"That neither husband nor wife shall in any case be a witness against the other except in a criminal prosecution for a crime committed one against the other, but they may in all criminal cases be witnesses for each other, and shall be subject to cross-examination as other witnesses, and shall in no event on a criminal trial be permitted to disclose communications made by one to the other except on a trial of an offense committed by one against the other."

Construing the above section in the case of *Tingley v. State,* 16 Okla. Cr. 639, 184 Pac. 599, it is said:

"In this case the defendant was charged with the murder of one W. H. Overholser, clearly not a crime against

his wife, or one necessarily involving the marital relation. The wife was not charged with any crime at all, and was on trial for no offense. She would not have been a competent witness in this trial against her husband as to any communications made by him concerning his relations with Nell Martin. It is obvious that under the provisions of the foregoing statute he was incompetent also to testify to these alleged communications between him and his wife, and this though the issue of insanity was presented."

However, while the defendant under the statute is incompetent to testify to communications between himself and his wife, all the testimony proposed to be given by him was not for that reason incompetent. The testimony offered as to statements made to him by deceased and as to their conversations concerning the latter's conduct with the wife of the defendant, and the wrongful and immoral conduct of deceased with the defendant's wife in his presence was competent and admissible, as tending to show one of the effective or actuating causes of the defendant's alleged insanity. It was also admissible as tending to show provocation.

The defendant offered to prove by the witness Alice Riddling that she was called from Wagoner to her father's home near Leach on April 2, 1917, to attend the funeral of her mother; that she was at the funeral with her brother, John Steeley, the defendant, and Mame Steeley, his wife, was there also, and just before they started from the grave witness asked Mame to come and go home with her and the defendant, and Mame Steeley put her hand on her husband's shoulder and said, "John, I love you, but that son of a bitch of a stepfather of mine won't let us live together;" that the defendant looked very much disturbed and pale, but said nothing.

We think this evidence is competent and admissible. The statute which prohibits either the husband or wife from testifying to communications made by one to the other has no application to a third person or persons who may overhear communications between them, and such person or persons may testify to communications overheard by them between husband and wife.

Other rulings of the court rejecting the testimony of three or four witnesses for the defendant are argued at some length in his brief. As this testimony was auxiliary to and connected with the testimony offered and herein discussed, we do not think it is necessary to consider the same.

The instructions given by the court did not include the law of manslaughter in the first degree. Considering the testimony herein held to have been improperly rejected, and the other evidence in the case, we are inclined to think that on another trial the issue of manslaughter in the first degree should be submitted to the jury. We understand the law to be well settled that the unlawful taking of human life, when done purposely, is murder, unless there is sufficient provocation, and the provocation must be a sufficient one to arouse anger and passon to a degree that prevents all premeditation and deliberation.

Bishop says:

"To determine whether or not the conduct of the person killed was a provocation reducing the homicide to manslaughter, the test is, not whether what he did is indictable, but whether the law deems it calculated to excite passions beyond control. * * * Adultery is not an indictable offense; yet of all the provocations which can excite man to madness the law recognizes it as the highest and strongest."

"If, in a particular case, there has been passion, but it was ended when the homicide occurred, it cannot reduce the killing to a lower degree." 2 Bishop's New Crim. Law, §§ 710, 711.

Where there is time for deliberation, and where there is a purpose to kill, deliberately conceived and executed, the law refuses to mitigate the offense, and holds it to be murder, and where the defendant claimed that he shot deceased because the latter had debauched defendant's wife, and had taken her from the defendant, and was at the time of the homicide living in open adultery with her, even though the jury might believe this evidence, it would not justify the defendant in lying in wait to shoot deceased.

On this question the evidence in the case is conflicting. The law is merciful where a sudden passion arising from an adequate provocation impels a man to take human life, and then the offense is manslaughter in the first degree only, and not murder, but in order to reduce the offense to this degree the reason of the defendant must at the time of the act be disturbed or obscured by passion to an extent that prevents premeditation and deliberation, and in cases of that kind, where the defendant is smarting under a provocation so recent and strong that he cannot be considered as being at the time capable of deliberation, the offense may be reduced to manslaughter in the first degree, and the question is for the jury to determine.

The law is well settled that in a prosecution for murder the court should submit the case to the jury for consideration upon every degree of homicide which the evidence in any reasonable view of it suggests; and, if the evidence tends to prove different degrees, the law of each degree which the evidence tends to prove should be submitted to the jury, whether it be requested on the part of

the defendant or not. *Cannon v. Territory,* 1 Okla. Cr. 600, 99 Pac. 622.

There is no need of considering the other assignments of error. They present questions that do not inhere in the case and can scarcely again arise.

Because the county attorney was disqualified to sign and present the information, the judgment is reversed, and the cause remanded, with direction to sustain the motion to set aside the information, and for further proceedings in accordance with the views herein expressed as shall be required by law. The warden of the penitentiary will deliver the defendant to the sheriff of Delaware county, who will receive and keep him in his custody until discharged therefrom by due course of law.

ARMSTRONG and MATSON, JJ., concur.