## W. LESTER SCOTT v. STATE.

No. A-8959. May 1, 1936.
(57 Pac. [2d] 639.)

Billingsley & Kennerly, Anglin & Stevenson, and Vernon Roberts, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Jess L. Pullen. Asst. Atty. Gen., for the State.

DOYLE, J. The plaintiff in error, hereinafter called the defendant, was convicted in the district court of Seminole county of the murder of his wife, Willie Scott, alleged to have been committed in said county on the 8th day of November, 1931, and his punishment fixed at life imprisonment in the state penitentiary. From the judgment rendered April 29, 1935, in conformity with the verdict of the jury, he appeals. The alleged errors relied on are that the county attorney in his opening statement made remarks prejudicial to the defendant; error of the court in its rulings on the admission of evidence; error in giving instruction No. 8; and that the evidence is insufficient to support the verdict.

The evidence shows that on the night of the 8th day of November, 1931, the Frisco passenger train south out of Sasakwa, after going a little less than two miles, ran into a Ford car on a highway crossing; the car lodged on the engine pilot. The train was stopped within 200 yards from the crossing and the engineer, Barney Mc-Cook, the fireman, J. E. Bryan, the conductor, E. L. Workman, and the train porter went forward and found in the car the dead body of a woman, dressed in pajamas, a white sweater, a white cap on the head, and slippers on the feet. The body was cold and stiff. This train arrived there between 1 and 2 o'clock in the morning; the train was backed to Sasakwa, there the train crew notified citizens of the fact that they had found this body. Officials at Sasakwa, a justice of the peace and a deputy sheriff and several others came to where the body was in the wrecked car and held a coroner's inquest. It appears that the skull had been fractured in several places, several of the front teeth knocked out, jaw fractured, and that a blunt

instrument had been used to inflict the injuries; there were also fractures on the right arm, and bruises on the body, and the great toe of the left foot was gone.

Jerome Chambers, justice of the peace, and Charles Lyon, deputy sheriff, then took up the trail of the Ford car at the crossing and followed it to an old vacant farm house, on what is known as the "Jim Taylor place," a little less than three miles north and east of the railroad crossing in Seminole county. There they found in the yard an old mattress which was blood soaked and under it there was a pool of blood. They also found some gold dental bridge work. They followed the trail from the old house to the home of the defendant about seven miles north and east of said railroad crossing. The defendant was at his home. They asked him where his wife was. He said:

"When I left here yesterday evening about dark she was talking of going to Holdenville to her mother's, I went over to Ernest Tidwell's and stayed all night, when I got back this morning she was not here."

It appears that the defendant was the intended beneficiary of two insurance policies upon the life of his wife. One "Automobile Travel," while operating, driving, riding in, adjusting, or cranking an automobile, in the event of death, $1,000; also a $2,000 policy, maximum benefit $4,000 in case of travel accident death, both policies being in full force and effect on the 8th day of November, 1931, and that the defendant had knowledge of the fact of their existence.

It appears that Mabel Clour and Ernest Tidwell were also arrested at the time and held for a short time. Following the preliminary examination, the defendant was released on bail. Upon his release he went to the home

of Mrs. Moore, mother of the deceased, was invited in, and there stated that he knew how his wife, Willie Scott, was killed   He said:

"She was not killed with a gun, she was killed with a car crank.   She ran around the house and as she came around they hit her once.   She threw her hands in the air and ran towards the car and fell near the car, and they beat her to death there."

And further stated:  "I have got to kill the testimony of Mabel Clour or I am good for the electric chair."   The statements were made to Mrs. Moore, mother of the deceased, in the presence of Beulah Palmer, a sister of the deceased; that the day following his arrest the defendant and Mabel Clour, while in the county attorney's office and in the presence of the county attorney and Roland Robertson, evidence man, the defendant told Mabel Clour to keep her mouth shut and not to get scared too easily.

The evidence shows that on the 16th day of February, 1932, the defendant and Mabel Clour were married at McAlester.

The defendant did not offer himself as a witness, but undertook to show by the testimony of several witnesses that he was at the home of Ernest Tidwell the night his wife was murdered.

Effie Tidwell testified that she remembered the occasion of hearing about the death of the defendant's wife; that she saw the defendant at her house about 8 o'clock; that there were three rooms in her house; that she slept in the middle room that night with her children; that the defendant first came in the middle room and talked to her husband about three or four hours, saying that he came there to meet Mabel Clour; that Mabel did not come over there that night; that the defendant went to

bed in the south room that night, and left the next morning just before daybreak.

Ernest Tidwell testified that he saw the defendant that night at his home; that he had retired for the night; that the defendant called to him and he got up and invited him in the house; that the defendant replied he "reckoned he did not have time," that the defendant told him that he had come over to meet Mabel Clour; that they sat up in the house and talked and went to bed about 12 or 12:30 o'clock; that the defendant slept in the south room; that he did not know whether or not the defendant left the house after he got there; that it was 6 2/4 of a mile from his house to Sasakwa; that the defendant was his landlord before he moved to his present home; that the defendant had never spent a night before at his place; that there was an outside door to the south room.

Ira Abbott testified that he lived about three miles south of Spaulding; that he had known the defendant's wife quite a while; that he saw her that night about one mile south and one mile east of the defendant's home; that witness was taking some chickens to Sentinel, Okla., and had left home about 7:30 that night; that Willie Scott, the deceased, passed him going west towards Sasakwa; that there was a man in the car with her and the man was not Lester Scott.

Several witnesses testified to seeing the defendant on horseback going west from his home the evening before and going south the morning after the body was found.

Several witnesses testified that the defendant had a good dwelling house, good barn, and good improvements on his farm of 160 acres of land in Little River bottom, worth seven or eight thousand dollars.

The record shows that the county attorney in making the opening statement to the jury, among other things, said:

"That we expect the evidence to show this—that the Tuesday night before the happening of this homicide Sunday night, I believe it was, he told Mabel Clour that he was going to kill Willie Scott and place her body on the railroad track near the place where it was found; that he made that statement to her, and we expect the evidence to show that fact.

"That on one occasion when they were up in the jail, the testimony will show that there was a conversation took place there between Mabel Clour and Lester Scott, in the presence of J. R. Robertson, who was working in the county attorney's office as the evidence man of this county. That in that conversation Robertson called attention to the fact that Mabel Clour had made this statement as to the conversation had with him down at Scott's house on the Tuesday night preceding the homicide and he told him——. By Mr. Stevenson: We object to any statement that the officer may have made, if the court please. By the Court: Overruled. Exception. He said, 'Now, Less, you will soon be released on bond and when you get out I don't want you to mistreat this little girl,' having reference to Mabel Clour. He said he would not. He said: 'I know what Mabel said was true,' or 'I did say what Mabel said in the statement, but I didn't mean it.' "

Counsel in their brief say:

"Mabel Clour did not appear, she did not testify, and the county attorney knew she would not testify because she was an incompetent witness, she being the wife of the defendant, in this connection we call the court's attention to Kaul v. State, 43 Okla. Cr. 56, 277 Pac. 278."

Under the provisions of section 3069, neither spouse may testify against the other in a prosecution of either for an offense committed before marriage, except as to

an offense involving an injury personal to him or her, and in a prosecution for murder the competency of the wife of the defendant as a witness depends upon the relationship at the time of the trial, and not as to whether she was his wife at the time the alleged crime was committed, and even where marriage had been contracted prior to the trial for the evident purpose of excluding such testimony, it would not be admissible. Kaul v. State, supra; Lacey v. State, 27 Okla. Cr. 42, 224 Pac. 994; Cargill v. State, 25 Okla. Cr. 314, 220 Pac. 64, 35 A. L. R. 133; 76 A. L. R. 1088, Annotation.

An opening statement is to advise the jury concerning the questions of fact involved, so as to prepare their minds for the evidence to be heard. The scope of the opening statement should be limited to getting before the jury a detail of the testimony expected to be offered, and facts should not be stated which cannot be proved. Call v. State, 39 Okla. Cr. 264, 264 Pac. 643.

In Steeley v. State, 17 Okla. Cr. 252, 187 Pac. 821, 826, it is held:

"The statute which prohibits either the husband or wife from testifying to communications made by one to the other has no application to a third person or persons who may overhear communications between them, and such person or persons may testify to communications overheard by them between husband and wife."

In Shacklett v. State, 23 Okla. Cr. 4, 211 Pac. 1063, it is said:

"Ordinarily, error cannot be predicated upon the opening statement of a prosecuting attorney to the jury, specifically stating what facts he expects to develop in testimony, where later, for some reason, he fails to introduce evidence to support some of the narrative related in the opening statement, unless such unsupported por-

tions of the opening statement were made in bad faith and were manifestly prejudicial."

Upon the record before us it follows from what has been said the statements of the county attorney were not improper, and the court did not err in overruling the objection thereto.

Some objections were made and exceptions taken to rulings of the court in admitting in evidence the two insurance policies taken out by the deceased and made payable to the defendant.

The evidence shows that the fact of their existence was known to the defendant before the death of his wife. This evidence was undoubtedly admitted upon the theory that it tended to prove a motive on the part of the defendant in killing the deceased, and was clearly admissible upon the theory that there was a motive on his part for the killing. It follows that the court did not err in overruling the objections taken.

Instruction No. 8 excepted to is admittedly a correct statement of the law of principals as defined by Penal Code, § 1808, St. 1931. It was not irrelevant to the evidence, and objection thereto was properly overruled.

Finally it is insisted that the evidence is insufficient to support the verdict of the jury.

On the part of the state it is insisted that the incriminating facts and circumstances, coupled with the defendant's statements to the mother of the deceased, after he was released on bond, are incapable of explanation consistent with his innocence.

Where the evidence is circumstantial and the circumstances are such as to reasonably justify the inference of guilt, the weight and value of such testimony are exclusive-

ly for the jury. It is only where the evidence does not obviously warrant the inference of guilt that this court will interfere, otherwise the weight of circumstantial evidence and the inference to be drawn from it, in almost every case, would finally be determined by the appellate court. This court has repeatedly held that all that is required of the appellate court in determining the sufficiency of the evidence to support a conviction is to find that there is evidence in the record which forms a sufficient basis for the verdict of the jury. The credibility of the testimony of the witnesses testifying on the part of the defendant is the exclusive province of the jury to determine, and, although such testimony may be uncontradicted and not directly impeached, when there are facts and circumstances in evidence tending to lessen the probability that such testimony is true, the jury may give it such weight they deem proper, even to the extent of wholly disregarding the same.

It is our conclusion, after a careful examination of the entire record, that the defendant had a fair and impartial trial and that his conviction is sustained by the evidence and the law.

It is therefore ordered and adjudged that the judgment of the district court of Seminole county, that the defendant is guilty of the crime of murder, and assessing the punishment at imprisonment in the state penitentiary for life, be and the same is hereby affirmed.

EDWARDS, P. J., and DAVENPORT, J., concur.