## HILYARD v. STATE.

No. A-11074. Feb. 15, 1950.

(214 P. 2d 953.)

436

Garrett & Garrett, Muskogee, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Lewis A. Wallace, Asst. Atty. Gen., for defendant in error.

POWELL, J. The defendant, Dewey Hilyard, was charged by information filed in the district court of Mus-

kogee county with the crime of grand larceny, was tried before a jury, convicted, and his punishment fixed at imprisonment in the State Penitentiary for a term of five years. Appeal has been perfected to this court.

The evidence on the part of the state to support the conviction of the defendant was purely circumstantial. The prosecuting witness, J. H. Beasley, testified that he was in the steel erection and construction business in Muskogee, that he had lived there since 1943, on Elmira street; that he had $19,170 in a two or two-and-a-half inch pipe, 18 inches to two feet long, capped at each end; that the pipe was in the attic of his home four or five feet in an easterly direction from the opening in the ceiling to the attic, was between the rafters and on the insulation, with an insulation board over it; that the attic opening was down into a closet in the south bedroom; that the money was in bills: ones, fives, tens, twenties and hundreds. Witness further testified that he placed the money there in two or three trips, and that he last saw the money the latter part of August, or first part of September, 1946; that he first missed the money December 14, 1946; that he kept a safety deposit box at both the First National Bank and at the Commercial National Bank, in Muskogee and no member of his family knew he had any money in his attic. He testified that it was getting dark on December 14, 1946, when he first missed his money. He reported his loss to the police that night, and he and Mr. Goad, who was operating the Standard Plumbing Company, and an officer from the Muskogee Police Department went to Tulsa, Oklahoma City, and back into Muskogee looking for Dewey Hilyard. That Dewey Hilyard was the plumber who had been in his attic in connection with the installation of a heater.

Mrs. J. II. Beasley testified that on November 7, 1946, she 'phoned the Standard Plumbing Company, Muskogee, to send out a plumber to install a heater in a bedroom of her home, and they sent Dewey Hilyard; that he got there in the middle of the afternoon and stayed until 5 o'clock; that he came back the next morning about 8 o'clock; that she left him there alone about 11 o'clock in the morning and does not know when he finished; that he had a ladder to get up and down through the closet, which was in the south bedroom; that the back door had a lock that would lock when the door was closed, and when she returned home it was locked; that an electrician was there for about 15 or 20 minutes before she left, but did not go into the attic. Witness testified that she had never seen the gas pipe in question and did not know that her husband had any money hidden in the attic. She testified that her husband and the defendant plumber were the only persons she ever knew going into the attic.

Elvin Goad testified that he had lived in Muskogee since 1928, and was engaged in the plumbing since 1928, and was engaged in the plumbing business and was operating the Standard Plumbing Company in November, 1946, and that the defendant, Dewey Hilyard, was one of his employees; that in answer to a call for a plumber he sent him to 2124 Elmira, the home of J. H. Beasley, to do some work. That Hilyard had been working for him about six months; that he worked for him for two days after completing the Beasley job; later he testified that his pay-roll record indicated November 8, 1946, to be the last day defendant worked. That Hilyard left without notice to him, but two or three weeks later did a job on west Okmulgee street, at John Bonicelli's drive-in. He testified that the type heater that was installed in the Beasley home required the plumber to go into the attic. That

some time after Hilyard did the work, Mr. Beasley reported to witness the loss of the money, and he went with Beasley trying to locate Hilyard. On cross-examination witness testified that defendant was then in his employment as a plumber, and had been since in September, 1947; that a week after Hilyard left following the Beasley job, witness found out that defendant had been called to Oklahoma City due to the death of some member of his family; that his pay was $2 per hour, with time and a half for work over 40 hours per week. Witness further testified that he knew that defendant operated some beer joints on the side, and had been picked up by the officers for selling or hauling whisky and had been fined for being drunk. Witness testified that he had five plumbers working for him.

Houston Jackson, detective for the city of Muskogee, testified that in December, 1946, J. H. Beasley came to the police station and reported the loss of a large sum of money, somewhere around $19,000 or $20,000; that he had Hilyard in jail on the 9th or 10th of December investigating him concerning his possession of a 1941 Cadillac car, but he had been released just prior to the reported theft by Mr. Beasley. That Hilyard was arrested the day after the loss was reported; that Hilyard had told him that he purchased the Cadillac in Ohio, paying $3,250 for the same, and a check-up with the Ohio authorities proved this to be correct. That Hilyard told him he had the money to pay for the car by reason of the sale of a "beer joint" on North Main for $5,000, one on South Main for $1,500, and a cafe for $1,500, the sales having been made about a year before the car purchase. The defendant stated that he decided to go to Ohio to see his folks, took his wife and went to Tulsa where they caught a plane and went to Toledo, Ohio, where he stayed about a week. That he

took $5,000 with him. Witness testified that he had seen the defendant driving the Cadillac since about the 9th of December, 1946, and prior thereto he had seen him driving an old 1936 or 1937 Packard. Hilyard further told witness that while in Ohio he wired one Earl Castor, his brother-in-law, $3,000 by Western Union to purchase the Huber Coffee Shop, and he loaned his brother at Bethany $1,000; that he had $500 on his person when arrested. Defendant told witness he had picked up a fellow in Muskogee, took him to Tulsa, but got drunk on the way over and he woke up in a man's drive-way, less $400. Witness testified from notes which he swore he made when questioning defendant.

R. H. Wesson, manager of the Western Union Telegraph office in Muskogee, testified that his records showed that Dewey Hilyard, on November 26, 1946, wired from the State of Ohio the sum of $3,000 to Earl Castor, at Muskogee.

Walter R. Pearson, assistant cashier of the Commercial National Bank, Muskogee, testified that Dewey Hilyard had business transactions with his bank. He borrowed $40 on August 30, 1945, $58 September 11, and $100 November 3; $32 February 26, 1946, $42 May 21, $50 July 30, and $100 September 23. That Beatrice Hilyard, wife of the defendant, opened a savings account on November 9, 1946, depositing $100, and on December 4, 1946, deposited $800, on December 7, deposited $100; and that she withdrew this money December 18, 1946. That she had a checking account at the bank which was closed March 26, 1946, prior to opening the savings account. On cross-examination he testified that Beatrice Hilyard borrowed a total of $1,660 from the bank during the period from 1943 to 1946, in amounts from $32 to the highest

of $416; $100 being borrowed July 12, 1946, and repaid on November 8, 1946.

Elbert P. Ferguson testified that he purchased a "beer joint" on North Main street from the defendant in June, 1945, payng $2,200.

F. G. Harmon, business manager of the Commercial Credit Corporation, testified that the defendant Hilyard and wife had borrowed several times from his company; that defendant paid his indebtedness to them in cash December 4, 1946, prepaying a monthly installment loan that had eight months yet to go; that the loan was made August 8, 1946, for $430, and defendant and wife mortgaged their household goods.

William Jones Cook, public accountant, testified that he had lived in Muskogee 44 years and had been preparing tax returns for J. H. Beasley for a number of years from information furnished by Beasley, and that for a period of three years Beasley paid a total of $10,462 income taxes; that Beasley was claiming a loss on account of the alleged theft.

Mrs. Gladys Shackelford testified that she loaned Mrs. Beatrice Hilyard $200 the early part of 1946 so that she could purchase a cafe, and that Mrs. Hilyard repaid the loan in 15 days, although it was made for 30.

The defendant did not testify, and neither did his wife. He used two witnesses, J. Lacy DeGraffenried, county assessor of Muskogee county, and Earl Castor, his brother-in-law.

DeGraffenried testified that J. H. Beasley in his tax assessment list for 1945 swore that he had on hand "money on deposit, including certificates of deposit and postal savings, $300." And money on hand, "none", and made the

same report for 1946 and 1947. He further testified that the defendant Hilyard made no assessment for 1945, 1946 and 1947.

Earl Castor testified that the defendant's wife was his sister; that he had been a fireman with the Muskogee Fire Department for nearly six years, worked around 10 hours a day; that he had been more or less handling the accounts of Mr. and Mrs. Hilyard over a period of years; that he sold a beer tavern for them on North Main for $2,200, and one on South Main for $1,500; that he sold the Arcade Bar for them for $1,800 in August, 1945, and sold a cream station for them for $600; that he got $6 per day for his services while working for them but did not get anything for his trades; that the money would be paid to his sister by the purchasers, and she would give it to him to keep for her and the defendant; that this commenced in 1944. He admitted that he did not keep a bank account for his sister and the defendant, but kept the cash in his "tomato-can bank" at his home. He did not remember the different dates the properties sold. That through him they loaned his brother in Oklahoma City $3,000 for an operation, but he could not remember the month or the year. The county attorney understood the answer to be $2,000, according to the record, and this was never cleared up. The money was paid in cash. Castor testified that he had on hand $8,000 in cash belonging to his sister and defendant at the time they were going to Ohio, and gave it all to them. He testified that he kept the money in cash in three tin fruit jars and sat them in his kitchen cabinet, but later stated that he kept the money under the floor in the basement of his home. He testified that his home belonged to his sister and the defendant. He further stated that he mortgaged his home for $1,000 to help purchase the north Main street bar

for $1,500, which he thereafter sold for $2,200; purchased the Arcade bar for $700 and sold it for $1,800; purchased the South Main street bar for $400 and sold it for $1,-500; the cream station for $50 and sold it for $600. He stated that he mortgaged the home to make his sister and her husband save and not waste their money, by keeping up the payments. That he had $2,000 of their money when he did this. He could not remember for sure whether his brother-in-law owned more than one of the beer bars at any one time or not, but thought that he did. He stated that the defendant was in the whisky business in 1945 and 1946. Witness did not know how much money he, personally, received for his services, as he did not keep a record. He stated that his wife was the head of his family and took care of his business, but she was then deceased. The county attorney asked:

"Q. What changed your mind at the time you turned over $8,000 to them when they went to Ohio? A. I will tell you. They came down to the house one day, came down there drunk and I had them throwed in jail and they came back again and my wife had them throwed in, and they came down there, and he wanted to go back on a vacation, he hadn't seen his folks for so long and I got it and let him have it, and they came down sober and I let them have it, and we had them picked up twice in one day, they came down there drunk. Q. The reason you gave it to him was because it was his money and you wasn't afraid he would get drunk and throw it away? A. I let him have it. It wasn't anything to me."

For reversal of this case defendant sets out some 16 specifications of error in petition in error, arguing the same under 17 propositions in his brief.

The defendant argues that the evidence adduced by the state was not sufficient to support the verdict of the jury, on the ground that the proof failed to establish the corpus delicti.

This court has held that the "corpus delicti" means, where applied to any particular offense, the actual commission by some one of the particular offense charged; that the corpus delicti may be established by circumstantial evidence, and may be established without showing that the offense charged was committed by the accused. Gorum v. State, 60 Okla. Cr. 248, 63 P. 2d 765; Dowell v. State, 74 Okla. Cr. 6, 122 P. 2d 406.

Here the complaining witness, J. H. Beasley, testified that he placed the sum of $19,170 in a gas pipe and placed the same in his attic; Beasley, according to the evidence, was in the steel erection and construction business. William Jones Cook, a public accountant, testified that he had been making out Beasley's income tax reports for some time, and that during "the last three years" his client had paid $10,426 income taxes, so that it was established that Beasley had earned enough money to have had the sum stated. Under the facts it was within the province of the jury to determine if they believed from the evidence pointed out, and which was not contradicted, that: First, the crime charged had been committed; and, second, to determine whether or not the defendant committed the crime.

This court held in the case of Brown v. State, 13 Okla. Cr. 111, 162 P. 449:

"In a prosecution for larceny of a domestic animal, circumstantial evidence may be resorted to for the purpose of proving the corpus delicti, in the same way and to the same extent that it may be for the purpose of connecting the accused with the commission of the offense."

Was there sufficient evidence in the record to support the verdict of the jury in finding the defendant guilty? This court has repeatedly held that where the state relies on circumstantial evidence, circumstances must

be such as to preclude every reasonable hypothesis other than defendant's guilt.

The evidence shows that the plumbing company, on November 6, 1946, sent the defendant to J. H. Beasley's residence in Muskogee to install a heater that required the plumber to enter the attic. The defendant's employer testified to that. Mrs. Beasley testified that the defendant did enter the attic; that he came to her home on November 7, 1946, in the middle of the afternoon; that he returned the next morning and that she left him there about 11 a. m., and that he was gone when she returned, and had closed the back door, which automatically locked. She further testified since her residence in the home no one had ever entered the attic except her husband and the defendant. On discovery of his loss, December 14, 1946, Mr. Beasley promptly reported the loss.

The evidence showed that defendant and wife, prior to November 6, 1946, had for a period of years borrowed small sums of money regularly from various lending agencies; that they drove a ten-year old Packard car. On November 8, 1946, they prepaid a loan that had eight months to go, and that they paid off other debts, loaned various large sums of money, purchased a Cadillac car for $3,250, and took a trip by plane to Ohio, etc.

The defendant and his wife did not testify, but attemped to show that they had $8,000 in cash in trust with the witness Earl Castor, who was the brother-in-law of the defendant. Castor testified that he kept the money in tin cans, under his basement floor. He did not use a bank and write checks. And whereas, from the evidence, the complaining witness possibly paid his income tax on the money that he lost, he certainly did not pay his intangible tax to the county treasurer of Muskogee county based

on the sum claimed to have been stolen. His action in keeping large sums of money hidden in his attic, and not even within the knowledge of his wife, when he had two lock boxes in local banks, is most mystifying and unusual. The money was subject to the hazard of fire, Beasely's death without any of his heirs ever discovering the funds, and, of course, subject to theft. But, too, the evidence shows that the defendant did not even list his personal property or intangible property for taxes with Muskogee county, and his agent Earl Castor, though by his own testimony an efficient property seller for defendant, and personal tin-can banker, knew nothing of the income tax angle, and did not even know about his own reports.

So far as the evidence is concerned, we conclude from a consideration of all the evidence, that it was sufficient to support the verdict of guilty found by the jury. This is a close case, however, and such fact will have a bearing on a subsequent proposition that we will hereinafter consider.

The defendant contends that the state failed to prove the ownership of the money alleged to have been stolen and that it was taken without the owner's consent. The Attorney General calls attention to the fact that in Fuller v. State, 70 Okla. Cr. 408, 106 P. 2d 832, this court held that the lack of consent may be proven by circumstantial evidence, and that in Butler v. State, 60 Okla. Cr. 188, 62 P. 2d 662, it was held that the status of property is of no concern to the thief. But the defendant contends that because the state might have proven by the complaining witness by direct testimony whether or not the money was taken with or without his consent, and that the money was his, and did not do so, that the Fuller case is applicable. Not so. It is true that the county attorney failed to ask the complaining witness the direct questions involv-

ed in the subject, and that he should have asked, yet ample circumstances have heretofore been recited to show that the money was taken by someone from the residence of Beasley without his knowledge or consent, and a study of the case of Fuller v. State, supra, will show it applicable.

The defendant raises one proposition that while under a different factual situation might not constitute reversible error, yet here where the evidence is entirely circumstantial, presents a serious question. Defendant contends:

"That the court erred in admitting prejudicial, incompetent, and inmaterial statements made by the county attorney in the opening statement to the jury, over the objections and exceptions of the plaintiff in error."

Of the statements made by the county attorney, we do not find merit in the objections raised by the defendant to such statements, except the following:

"* * * and he [Hilyard, the defendant] came back in his car [the Cadillac] and made various displays of large sums of money * * * and they were down here on Main Street and that was in the Convention Hall where the big boys had parties and he and his wife got in an argument and fight and his wife stated in his presence she was going to tell the officers where he got his money and he gets a pistol and ran around there and they had a big to-do."

This was a very material matter. Proof that soon after the defendant drove back from Ohio in the Cadillac, that he was showing large sums of money and his wife had made statements threatening to expose defendant and to show where he had gotten so much money, would have certainly strengthened the state's case, and even though the state had been unable to show that the wife had specifically indicated that defendant had stolen the money of the complaining witness, proof of just the statement would

have been valuable. The statement of the county attorney left an inference that the wife by her purported remarks to her husband had been on the verge at least of exposing some kind of wrongdoing of her husband in his acquisition of the large sums of money the county attorney stated he had been displaying.

No evidence was offered to prove that these things happened. Evidence from third parties who could have testified to the matters stated would have been admissible. Steeley v. State, 17 Okla. Cr. 252, 187 P. 821. The county attorney when he made his opening statement well knew that he could not use the wife of the defendant as a witness, but could only cross-examine her should she voluntarily take the stand as a witness for her husband. If he was just repeating statements that she may have made to him, he knew that he could not offer evidence of such statements. Kaul v. State, 43 Okla. Cr. 56, 277 P. 278; Tit. 22 O.S.A. § 702. He also knew whether or not he had any witness not under disability who would testify to the matters suggested in his opening statement. We must conclude that he could make no such poof, or else he would have done so.

It is true that under the holdings of this court, in his argument to the jury the county attorney could properly call to the attention of the jury that though the wife was a material witness for her husband an explanation of how and where he obtained the $8,000 taken by them to Ohio, and had been in the courtroom during the trial, that she failed to testify for her husband. See McCurdy v. State, 39 Okla. Cr. 310, 264 P. 925, 926, where it is said:

"Where the wife of an accused in a criminal case might be a material witness in his behalf and she is not placed upon the stand by him, nor her absence account-

ed for, the failure to produce her as a witness to testify is a legitimate matter for comment in the argument of the case."

Yet, the mentioning of such fact by the county attorney in his argument to the jury tended, no doubt, to emphasize that the wife had vital information not favorable to her husband that she was withholding, and this may have tended to cause the jurors to take for granted as true the matters enumerated by the county attorney in his opening statement above set out, together with the inferences to be drawn therefrom, and to support which he offered no evidence. And by reason of the fact that the evidence relied on for conviction was entirely circumstantial, and though there were sufficient circumstances shown by the evidence to support the verdict of the jury and judgment rendered, nevertheless, the statements heretofore quoted, and made by the county attorney in his opening statement, were such that he knew he could not prove, and it is our opinion from a study of the entire record that such statements, unsupported by evidence, were, under the facts in this case, clearly prejudicial.

The principle of law involved is set out in Welch v. State, 41 Okla. Cr. 207, 271 P. 172, and being:

"The purpose of an opening statement is to advise the jury concerning the question of fact to be submitted to it, so as to prepare the minds of the jurors for the evidence to be heard. No facts should be stated which cannot be proved."

And see Scott v. State, 59 Okla. Cr. 231, 57 P. 2d 639, 640, in which the court said:

"Ordinarily, error cannot be predicated upon the opening statement of a prosecuting attorney to the jury, specifically stating what facts he expects to develop in testimony, where later, for some reason, he fails to introduce evidence to support some of the narrative related in the

opening statement, unless such unsupported portions of the opening statement were made in bad faith and were manifestly prejudicial."

In that case, by reason of the overwhelming evidence of the guilt of the defendant, the remarks of the county attorney in his opening statement and complained of, were not held error. But in the case of Hall v. State, 68 Okla. Cr. 367, 99 P. 2d 163, the failure of the county attorney to offer evidence to prove matters stated in his opening statement, together with questions asked jurors on voir dire and his argument to the jury, taken together, caused the court to modify the judgment.

The witness Castor accounted for $8,000 of the money the defendant had, if the jury had believed him, but his evidence was not strong enough to account for further sums. The jury assessed the maximum punishment for grand larceny, and the unsupported statements of the county attorney may have accounted for this.

Defendant enumerates other alleged errors, as stated, one being that juryman Bobo had a daughter working for and in the office of the complaining witness, Beasley, and that he should have disclosed that on his voir dire examination. The questions asked on voir dire examination are not disclosed, and on motion for new trial no evidence was offered tending to show the actual disqualification of the juror, and we do not find it necessary to go into this and other propositions raised, because such matters will not be involved in a new trial, which we deem necessary by reason of our conclusion that the statements made by the county attorney to the jury in his opening statement, and heretofore quoted, and considered in connection with other matters mentioned were in fact prejudicial, and that the record herein justifies the application of the rule of law hereinbefore set out.

For the reasons stated, the judgment appealed from is reversed, and the cause remanded for further proceedings in accordance with the views we have expressed.

JONES, P. J., and BRETT, J., concur.