Robert Brisbon TAYLOR, Plaintiff in Error,

v.

STATE of Oklahoma, Defendant in Error.

No. A–12137.

Criminal Court of Appeals of Oklahoma.

May 11, 1955.

William N. Mounger, Oklahoma City, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Lewis A. Wallace, Asst. Atty. Gen., for defendant in error.

JONES, Presiding Judge.

The defendant, Robert Brisbon Taylor, was charged by an information filed in the District Court of Oklahoma County with

the crime of murder, was tried, found guilty of manslaughter in the first degree by verdict of the jury who left the punishment to be assessed by the court. Thereafter defendant was sentenced to serve a term of 20 years imprisonment in the penitentiary.

The sole question presented by the appeal is whether the trial court erred in overruling the motion for new trial on the ground of newly discovered evidence. A consideration of this assignment of error requires a review of the evidence.

Defendant owned a duplex apartment at 8 Southwest 25th Street in Oklahoma City. On December 12, 1953, he rented the west side of the apartment to the deceased, Daniel Riley Sampson, who agreed to pay as rent the sum of $65 per month with all utility bills being paid by the defendant. The deceased, aged 33, together with his wife and two small children continued to occupy the apartment until his death on January 15, 1954.

The defendant, aged 69, together with his wife and nine year old grandson occupied the other half of the apartment. At the time the apartment was rented to the deceased a payment of $16 for one week's rent was made by him. At the expiration of that week no further rental payments were made. Demand was made on several occasions by defendant or his wife upon the deceased or his wife for payment of the rent. At the time each of these requests was made Sampson or his wife would promise the defendant that they would make full payment for a month's rent just as quickly as Sampson received a check which he had coming to him for services he had rendered as a member of an oil well casing crew. Shortly after January 1, 1954, defendant and his wife consulted an attorney for the purpose of starting proceedings to evict the deceased and his family from the apartment. A five day notice to terminate the tenancy was served followed by a three day notice and on the morning of the homicide (January 15, 1954) a lawsuit was filed before a justice of the peace seeking recovery of the apartment and judgment for the past due rent.

Mrs. Sampson, wife of the deceased, testified that she arose about 8:30 A.M. on January 15 and tried to light a fire but found they had no gas. She informed her husband who took a pair of pliers and went to the meter and turned on the gas. Later in the day when she tried to light a fire she found the gas had been turned off. About 10:30 A.M. she was hanging some clothes in the yard when the defendant came to her and told her not to turn on the gas. At 5:45 P.M. Mrs. Sampson went to the Blue Ribbon Bar and Grill which was the place where the oil field casing crew generally stayed when not working. She there found her husband and told him the gas was not on. The deceased had previously consulted an attorney about the situation which had developed over the rent and he told his wife that the attorney had told him that he had legal permission to turn on the gas. Deceased then left to go the four blocks to their home to turn on the gas. Shortly thereafter Mrs. Sampson came out of a place of business and saw a friend by the name of Kenny Sexton who gave her a ride home in his automobile; that she had just gotten out of the car with her children and was about 15 feet from the house when she heard a shot. She ran around the house and saw her husband coming between the houses. When he got to within 10 feet of her he staggered, fell on his back and died. He had a cigarette in his mouth. She saw blood gushing from near his chest and a pair of pliers was lying on the ground by his hand. She further testified that she saw defendant back of the car and said to him, "You killed my husband," and that he said, "Yes, I know what I did and if you don't get away I will kill you too." Defendant was standing there with a gun in his hand. That Mrs. Sampson then grabbed her little boy and ran into her house.

Jack Avery testified that on the evening of January 15, 1954, he and his wife were eating with the Cosbys who lived on the back of the lot where the shooting occurred. When he arrived at the Cosby home about 6:10 P.M. he saw Mr. and Mrs. Taylor sitting in a car headed northeast in front of the gas meter. Taylor was under the steering wheel and the car motor was running. Two children were playing in the yard. About 6:15 P.M. while they were eating

they heard a shot and they ran to the door. The witness saw defendant come around the front of the car and put a pistol in the front of his trousers. The witness asked Taylor what happened and the witness said, "I warned him not to turn it on and I shot him."

Haskell Cosby testified substantially the same as Avery and he further testified that after the shot was fired he saw Sampson running down the side of the house and fall. He went up to where Sampson fell and Mrs. Sampson was there first and was bending over her husband and screaming. He returned to his house where they had taken Mr. Taylor. The ambulance soon arrived and also some policemen.

The testimony of Kenny Sexton was substantially corroborative of Mrs. Sampson's testimony concerning the events which occurred after the shot was fired.

Several police officers also testified. In substance their testimony was that when they arrived on the scene, Sampson's body was lying in a pool of blood at the northwest corner of the house. They talked to the defendant who admitted the shooting. Defendant further said Sampson had turned the gas on two or three times that day so he was waiting for deceased in his automobile. That Sampson came to the gas meter, leaned over it to turn it on and defendant stepped out of his car and asked him not to do that. That Sampson started back northwest toward the corner of the house and when he got to the corner defendant shot him. They examined the automatic pistol which defendant said he had used and saw that after the shot was fired the mechanism jammed and the loaded shell hung in the chamber so that a second shot could not be fired. The safety on the gun was still off. Then an examination of the body of the deceased showed that he was shot in the back and the bullet emerged at the front near the throat. When the body was unclothed at the funeral home, the spent bullet was in the front of the clothing. This spent bullet was identified and the ballistics expert later testified that he had examined the bullet and in his opinion it was fired from the .22 automatic pistol which was in the possession of the defendant at the time he was arrested by the officers.

Pictures of the scene of the homicide were identified and admitted in evidence as also were several pictures of the deceased.

Doctor Howard C. Hopps, a pathologist, testified that he examined the body of deceased for the purpose of determining the entrance and exit of the bullet. That he probed the wound and found that the bullet had entered in the back and had ranged upward on a direct line and emerged in front at the base of the neck. From the testimony of the pathologist it was established that in order for the bullet to strike the deceased in the back and proceed upward and out near the base of the neck, that either the person firing the shot would have to be below the deceased and firing upward or the deceased would have to be stooping at the time he was struck. If both men had been standing erect, the bullet would not have entered and taken the course which it did.

On behalf of the defendant Bert Dennison testified that the deceased at various times had been employed by him as an oil well caser. That after the shooting on January 15, 1954, he was sitting in the Blue Ribbon Bar and Grill when Kenny Sexton came in and informed him of the shooting and that he and Sexton returned to the Sampson house. That while he was there Mrs. Sampson was in the house with some officers and some photographers. That while he and Sexton were there Mrs. Sampson took him out on the porch and got a knife from under the porch and said, "Bud had a knife." That he took the knife home, washed off the blood and placed it in his closet. That he never told anyone about the knife until two or three days before the trial when defendant's attorney came to his house and he turned the knife over to him. He identified a kitchen knife as the one he allegedly received from Mrs. Sampson. Mrs. Dennison corroborated her husband's testimony that he brought home a knife the night of January 15 and hid it in the closet. The knife remained in the closet until Mr. Mounger came out and got it.

There was testimony from other witnesses concerning an incident where the deceased a few weeks prior to the homicide

allegedly had been beating his wife and his mother-in-law. Several witnesses testified to the good reputation of the defendant.

Defendant testified concerning the difficulties he had encountered with the Sampsons over the rent. He further testified that he heard the Sampsons talking in their apartment one night and heard Sampson say " * * * he was not going to pay those old people any rent; he was going to kill them." Defendant testified that after that he bought a gun for the protection of himself and his family because he was scared. That on the day of the shooting shortly before it occurred he was lying across the bed and his wife came and said, "Sampson is coming down, going to bring a shotgun. We had better get away from here." That they went out to their automobile, started the motor and were waiting for the little grandson to appear. Defendant then testified that he saw a man come around the corner of the house toward the gas meter. That he couldn't see anything in his hands; that he did not have a shotgun. That the man walked up to the middle meter and stooped down and turned the meter on. That defendant took out his gun and opened the car door. That he was not sure it was Sampson but thought it was and in that connection he testified, "There are other tenants around there. I didn't want to shoot some of them." That defendant stepped toward Sampson and said, "Mr. Sampson, don't turn that gas on." That Sampson turned around to the right. That Taylor could not see anything in his hands. That he couldn't see a knife or anything else. That Sampson started toward him. That he then noticed that Sampson had something that could have been a pair of pliers in his right hand. That he was afraid of Sampson so he fired before he could get close to him. That Sampson never said a word at all. That after defendant had shot Sampson that Sampson ran around the corner of the house and Taylor did not see him fall. That he first learned that he had hit him when Mrs. Sampson ran up and said that he had killed her husband. That he put the pistol back inside of his trousers and walked into the Cosbys' house where he waited until the officers arrived. That he was all "bumfuzzled" on account of what happened and did not remember what he said to the officers. But he did remember that he talked to the officers several times that night and also to some television people. On cross-examination Taylor said, "I couldn't see what he had in his hands—it seems like his hands was kind of down to his side—I couldn't see pliers—I didn't see no knife."

Mrs. Taylor, wife of defendant, related in substance the same facts as were narrated by the accused. She further testified that about 5:30 or 6:30 o'clock on January 15 she and Mr. Taylor prepared to go over to their daughter's house to spend the night. They went out to their automobile and started the motor and had been sitting in the car about 5 or 10 minutes waiting for their grandson when Sampson came around the house and turned on the gas at the meter. She heard her husband speak to Sampson and saw her husband have the gun in his hand. She did not see anything in Sampson's hand but saw him start toward her husband. That Sampson had something in his hand but she didn't know what it was. That she was not looking at the time the shot was fired as she had gotten out of the car and was stooping to pick up an old broom to strike Sampson so she did not know what position either of the men were in at the time the shot was fired.

In rebuttal Robert G. Gamble testified that he was employed by Television Station WKY-TV. That at the police station about 2 hours after the alleged shooting he took some television pictures and a tape recording of a conversation between Captain McLennan and the defendant. This recording was admitted in evidence. According to the transcript of the recording the following conversation occurred:

"Q. How many times did you shoot during the night? A. Once. One time.

"Q. Did you say anything to him before you shot? A. How's that?

"Q. Did you say anything to him before you shot? A. I begged him not to turn that meter on.

"Q. What did he say? A. He didn't pay me no mind at-tall. He just kept right on.

"Q. He just kept on turning it on? Did you say anything more to him? A. No, I begged him—I didn't say no more to him and I told him to stop and he started off and I said, 'Just wait a minute there.' He just went on, just as if nobody was saying anything to him.

"Q. You fired one shot and. he ran? A. Yes, sir.

"Q. And fell out in the street? A. Yes, sir.

"Q. That's what happened? A. Yes, sir."

Haskell Cosby, recalled as a witness, testified that he went to the body of the deceased and he saw a cigarette in the mouth of the deceased. He didn't see a knife and didn't even see the pliers until the body had been moved. Mrs. Sampson was screaming, "He killed my husband."

Kenny Sexton, recalled as a witness, testified that when he heard Mrs. Sampson scream he ran to where the body was lying and saw a cigarette in Sampson's mouth. He didn't see either a pair of pliers or a knife. He refuted the testimony of Bert Dennison concerning their visit to the Sampson home. He testified that he went to the home with Dennison and remained there about 30 minutes while the officers were still there. He said during all the time they were there, Dennison and Mrs. Sampson did not go out on the porch together. That the only time he saw Mrs. Sampson on the porch was when she stepped out so the television man could take a picture. That he was with Dennison constantly and left with him and knows that Mrs. Sampson never at any time was with Dennison alone while they were there.

Mrs. Sampson was recalled as a witness and denied that she picked up a knife near the body of her deceased husband. She stated the testimony of Dennison pertaining to the knife was false and that she never at any time handed him a knife or had any conversation with him about the knife.

Elva Little, a sister of deceased, testified that she arrived at the scene of the shooting shortly after it occurred and remained in the apartment of Mrs. Sampson until after 11:00 o'clock. That she saw Bert Dennison there and he was drunk. That Mrs. Sampson was never on the porch with Dennison during all the time Dennison was there.

Jack Jordan, Oklahoma City policeman, testified that he was at the Sampson house when Dennison arrived. He said that Dennison appeared to be drunk and tried to interfere while they were questioning witnesses. That he asked Dennison if he knew anything about the shooting and Dennison said he did not. That Dennison then left.

The motion for a new trial on the ground of newly discovered evidence was based upon the testimony of Julia Jackson, a cook at the Blue Ribbon Bar and Grill and Mary Inghram, a waitress at the Blue Ribbon Bar on the night of the homicide. Mary Inghram testified that on the night of January 15, 1954, she was tending bar at the Blue Ribbon Bar and Grill and saw Bud Sampson in that place of business. That she saw Bud Sampson go behind the counter and she told him to get out. That she did not see him take anything and when she turned around he had left. That she continued to work at the Blue Ribbon Bar and Grill for a little more than a week. That she first talked to Mr. Mounger, attorney for the defendant, on Thursday, April 22, at which time she related to him what she had observed. (The trial commenced on April 19 and was concluded on April 20.)

Julia Jackson testified that on January 15, 1954, she was a cook at the Blue Ribbon Bar and Grill and as such she had charge of the cooking utensils. She stated that that evening she missed a knife from her kitchen utensils. She described the knife as being long, slim and broad, and said that it didn't have too much of a sharp point. Counsel for the accused handed the witness the knife which had been admitted in evidence and the witness testified that it looked like the knife she had missed from her kitchen utensils, but she didn't want to be positive about it. She further testified that

defendant's counsel had come to the grill to talk to her twice before the trial and that she was busy each time and that on each of those occasions she told Mr. Mounger that if he would come to her home that she would talk to him about the case but that she did not get to see him and tell him what she knew until after the trial had finished.

Mr. Mounger, counsel for the accused, also testified as to the diligence he used in securing the information set forth in the motion for new trial on the ground of newly discovered evidence. He stated that he had talked to Mr. Dennison about the knife for the first time on April 13. That he talked to Mrs. Jackson, the cook, during the week but she had asked him to come to her apartment and gave him her address. That he went to her apartment several times but was unable to find her until after the trial had ended. On cross-examination he stated that neither he nor his co-counsel had made any effort to find the witness after the trial commenced and that the trial lasted two days and one night.

By statute it has been provided that a court may grant a new trial " * * when new evidence is discovered, material to the defendant, and which he could not with reasonable diligence have discovered before the trial." 22 O.S.1951 § 952. In construing this statute, it has been held:

"The granting of a motion for new trial on the ground of newly discovered evidence is addressed to the sound discretion of the trial court, and such motion should not be sustained unless there is a reasonable probability that the newly discovered evidence would have changed the result of the trial." Tobler v. State, 87 Okl.Cr. 25, 194 P.2d 202.

It is also necessary to show that with the exercise of due diligence the accused was unable to discover the evidence before the trial was concluded. Armstrong v. State, 61 Okl.Cr. 352, 68 P.2d 114; Henderson v. State, 94 Okl.Cr. 45, 230 P.2d 495, 23 A.L.R.2d 1292; Isom v. State, 55 Okl.Cr. 173, 26 P.2d 952. It has also been held:

"Where the alleged newly discovered evidence set forth in a motion for new trial is cumulative and there appears no reasonable probability of a different result upon another trial, a new trial should not be granted on such ground." Ingram v. State, 87 Okl.Cr. 223, 196 P.2d 534, 536.

The application of the above-established rules of law to the alleged newly discovered evidence has convinced us the court did not err in overruling the motion.

We think that with the exercise of diligence the alleged testimony could have been discovered. Although defendant's counsel had the address of the cook before the trial, no effort was made on the Sunday before the trial was started or during the two days of the trial to talk to the witness or secure her attendance. After the verdict of guilty was returned, counsel for the defendant was able to get in touch with both of the alleged witnesses and procure affidavits from them. We are compelled to conclude that if the same degree of diligence had been used before the trial, counsel could have become acquainted with the nature of the proposed testimony which the witnesses later undertook to give.

But this is only one of the grounds which the court would have for denying the motion. The overwhelming evidence in the record tends to show that the testimony of Bert Dennison pertaining to the knife is false. Every person who was present at the Sampson house during the time that Dennison was there refuted his testimony. Dennison himself was interrogated by the officers and he said that he knew nothing that would shed light on the case. Even the defendant Taylor and his wife who were the only living eyewitnesses to the shooting did not pretend to claim that the deceased had a knife in his hand. In the face of all this evidence the testimony concerning the knife was unconvincing. The witnesses who ran to Sampson immediately after the shooting and saw Mrs. Sampson at the body testified that she was screaming and in a hysterical condition. After she accused the defendant of killing her husband, she turned and ran screaming into her house. Her every act would tend to refute any idea that she detected a knife in the hands of the deceased and instantly

conceived the idea of seizing the knife and hiding it under the porch. A picture of the knife is incorporated in the record and the way it appears to us, it seems unlikely that any individual would seize it as a weapon. It appears to be a knife rounded on the end. It was not a sharp pointed knife nor even a very sharp knife in appearance. Counsel for the defendant would have us believe that the accused walked up to the gas meter with this knife in one hand, the pliers in the other to turn on the gas. The evidence would show that deceased had no knowledge that the defendant was sitting in his car close to the gas meter waiting for Sampson to appear. There had been nothing said to the deceased that would cause him to think that he should have. a knife with him when he went to turn on the meter. It was just after dark. He was smoking a cigarette. No knife was seen by any person at the scene of the homicide, not even by defendant nor his wife and we are forced to conclude that the whole story of the knife was injected into the picture in an attempt to confuse the issues and mislead the jury.

The above-cited cases also lay down the rule that the motion for a new trial on the ground of newly discovered evidence should be overruled unless there is a reasonable probability that upon a new trial a different result would be obtained. In considering this question there is a strong silent witness that speaks more eloquently of the facts surrounding the homicide than any living witness. We are referring to the photographs which show the nude body of the deceased with a bullet wound entering his back and the jagged wound at the base of the throat where the bullet emerged. The bullet wound in the back is to the right of the left shoulder blade, about two inches left of the backbone. In passing through the body of the deceased the bullet traveled upward on a straight line without hitting any obstacles to deflect it and emerged about six inches higher on the body of the deceased than from where it had entered. Any jury with a due regard for their oath of office would be compelled to conclude after viewing this picture that the deceased was stooping with his back to the defendant at the time the fatal shot was fired. If he had been in an upright position, the accused would have had to have dropped to his knees to have fired the shot to cause it to pass through the body on the angle at which it passed.

The jury took full account of the fact that the defendant prior to the fatal altercation had been an honest law-abiding citizen, while the deceased at times had drunk to excess and might have been, from the evidence, of a very quarrelsome disposition.

It is regrettable that a man of the age of the accused with a previous good reputation should become involved in such a tragedy but in so far as the record is concerned, the shooting was entirely unjustified from any reasonable viewpoint.

■ It is contended that the punishment was excessive, but in view of what we have hereinabove stated, we do not agree with this contention. The judgment and sentence of the District Court of Oklahoma County is affirmed.

BRETT and POWELL, JJ., concur.