George Walter STEVENSON, Plaintiff in Error,

v.

The STATE of Oklahoma, Defendant in Error.

No. A-16681.

Court of Criminal Appeals of Oklahoma.

May 31, 1972.

Burke G. Mordy, Ardmore, for plaintiff in error.

Larry Derryberry, Atty. Gen., Paul Ferguson, Asst. Atty. Gen., for defendant in error.

BUSSEY, Presiding Judge:

George Walter Stevenson, hereinafter referred to as defendant, was charged, tried, and convicted in the District Court of Garvin County, Oklahoma for the offense of Murder; his punishment was fixed at death, and from said judgment and sentence, a timely appeal has been perfected to this Court.

At the trial, Robert Washington testified that on the evening of January 4, 1971, he was at Mildred Hennessey's cafe in Wynnewood, Oklahoma. At approximately 9:00 o'clock p. m., he observed the defendant and Bill Turner talking for a short time; he testified that he did not hear what they were saying, although there was no suggestion that there was going to be any trouble. He observed the defendant walk away from Bill Turner and heard someone yell, "He's got a gun, he's got a gun." He looked up and saw the defendant pointing a gun at Turner. Defendant fired the weapon and Turner slumped to the floor. Washington went through a door and called the police and an ambulance. He testified that the de-

fendant's brother, Louis, took the gun from him and the defendant sat down in a booth. Also, Washington testified that Turner did not have his regular police jacket on, and that he did not see Turner with a gun or any type weapon in his hand prior to the shooting.

Lawrence Washington testified that he was at the cafe on the evening in question, and that at approximately 9:00 o'clock p. m., he observed Bill Turner and the defendant having a conversation. He was standing four or five feet away from them but did not overhear any of their conversation. He heard the defendant say, "Okay, man," and the defendant walked away. (Tr. 42) He next heard someone yell, "That man got a gun. That man got a gun." He saw the defendant pointing a gun at Turner; defendant fired the gun, and Turner fell to the floor. Washington testified that he did not see any weapon in Turner's hand prior to the shooting, nor did he hear Turner raise his voice while he was talking to the defendant.

Dr. John Moore (M.D.) testified that he examined the body of Bill Turner in the Emergency Room of the Pauls Valley General Hospital on the evening of January 4, 1971. He observed a perforating wound near the left ear with a small amount of blood. He testified that, in his opinion, the cause of death was "it had the appearance of a gunshot wound." (Tr. 64)

Louis Stevenson testified that he was the defendant's brother. On the evening in question, he was at the cafe with his brother and Andrew Vernon. After the shooting, he took the gun from the defendant and laid it in a chair; he subsequently picked it up and gave it to Andrew Vernon. On cross examination, he testified that the defendant asked him to bring him from Ardmore to Wynnewood for the purpose of seeing a lady. Defendant mentioned that he was going to attempt to borrow some money from Mildred Hennessey by pawning the gun. He testified that he heard a shot at about 9:30 or 10:00 o'clock p. m., that he had previously

met Turner, and that Turner was not dressed in a police uniform. When they picked Turner up, a gun fell to the floor.

Andrew Vernon testified that Louis Stevenson gave him the gun on the evening of January 4, 1971. He subsequently turned the gun over to the Deputy Sheriff Ralph Richards of Ardmore. His testimony on cross examination did not differ substantially from that of the defendant's brother.

Ralph Richards testified that he was a Deputy Sheriff of Carter County and received a gun from Andrew Vernon, which he subsequently turned over to Hudson Crouch.

Hudson Crouch testified that he received the gun from Deputy Sheriff Richards; he lifted the cylinder from the gun and found that there was one spent shell and five live rounds in the weapon. The gun and the shells were turned over to Sheriff Caves.

Shirleyne Smith testified that she was at the cafe on the evening in question. She testified that she was standing four to six feet from the defendant and observed him pointing a gun to the back. She did not see where the weapon was pointed, and when it discharged, she ran out the door. She had previously seen Bill Turner in the area where the weapon was pointed.

Nadine Rushing testified that she was at the cafe on the evening in question. She observed the defendant and Turner standing together talking. She testified that they were not talking in loud tones. She heard someone yell that he had a gun, and she observed some "shiny object" in the defendant's hand. She ran out the door and heard a shot.

Cecil Smith testified that he also was in the cafe on the evening in question. He testified that he was standing approximately six feet away from the defendant and Turner, who were engaged in a conversation. He testified that they were not talking loud, nor did they appear to be angry. He further testified that the defendant turned and walked away toward the front door. Defendant turned around and came back within four yards of Turner and shot him. He stated that he did not see Turner make any aggressive gesture toward the defendant prior to the shooting.

Freddie Smith testified that he was standing approximately three or four feet from Turner when he was shot. Smith testified that he did not actually see the shooting, nor did he actually see a gun in the defendant's hand. He testified that Turner did not make any menacing gestures.

Sheriff Caves testified that he obtained the pistol and shells from Hudson Crouch and placed them in the vault of the sheriff's office.

Clinton Jones testified that he was playing pool with Robert Washington on the evening in question. He heard someone yell, "He's got a gun," and then he observed the defendant with a gun in his hand. He testified that the defendant was approximately ten feet from Turner at the time the gun was fired. The defendant's brother came up from behind the right side of the defendant and took the gun from him.

Ronald High testified that he observed the defendant talking to Turner. The conversation lasted thirty to forty seconds, and the defendant then walked back south toward the door. He next observed the defendant coming back towards Turner, pointing the gun in his direction. He yelled, "He's got a gun, he's got a gun," and began to "ease out of the place." He did not see a weapon in Turner's hand prior to the shooting, nor did he hear Turner threaten the defendant.

Rex Holmes, Wynnewood Chief of Police, testified that Bill Turner was employed as a policeman and had been for approximately three months. Holmes testified that Turner was on call or on duty the night of January 4, 1971, about 8:30 or 9:00 o'clock. He testified on cross examination that each police officer was required to work 55 hours a week, a 40-

hour regular tour, and a 15-hour tour in addition, policing the northeast part of the city. He testified that his police officers were not required to wear a certain type of uniform while on official duty, but were required to be armed.

The defendant testified that he lived in Ardmore, Oklahoma, and that on January 4, 1971, his brother, Louis, and Andrew Vernon told him that a girl in Wynnewood wanted to see him. He testified that he took the gun, intending to pawn it to Mildred Hennessey. He testified that when they arrived in Wynnewood, he met Janie Bell Rushing and spent approximately 45 to 50 minutes visiting with her. He testified that she became sick and someone took her to the hospital. Defendant became concerned over her condition and attempted to get various people in the cafe to take him to the hospital. He testified that he told the people that "I'm not trying to get fresh with you—I'm just trying to find some of you all to take me out there." (Tr. 168) He testified that he could not drive because he did not have a driver's license. Defendant testified that he first saw Turner when he hollered at him near the stove and said, "Hey you, you stay out of here and quit meddling with these girls." (Tr. 168) He testified that he attempted to explain to Turner that he merely wanted to go to the hospital to see Janie Bell, wherein Turner stated, "You'll fool around and get the hurt put on you." (Tr. 170) He testified that someone standing near the pool table said, "Yes, he's got something there," which caused the defendant to wonder if that person, as well as Turner, were armed. He testified that he started to slowly walk out and Turner said, "You ain't going out." (Tr. 171) Defendant further testified that Turner pulled his jacket down, appearing to be drawing a weapon. The defendant drew his gun and shot. At the time he shot, he saw a gun in Turner's hand. He testified that his brother, Louis, asked him why he had done this, wherein the defendant stated, "Heck he tried to shoot me." (Tr. 171)

Defendant testified that he did not know that Turner was a police officer and did not intend to shoot anyone.

Louis Stevenson, defendant's brother, testified that the defendant asked him to take him to Wynnewood to see a lady. They picked up Vernon and proceeded to Wynnewood. His testimony of what transpired in the cafe did not differ substantially from that of the defendant.

Andrew Vernon was recalled and testified concerning the offense occurring in the cafe. His testimony did not differ substantially from that of the defendant.

Phillip Abram testified that he has known the defendant for approximately 33 years, and that, in his opinion, the defendant's reputation as to truthfulness and law-abiding ability is good. He testified on cross examination that he did not know that the defendant was a convicted felon, but would still have the exact same opinion that the defendant was a truthful, law-abiding citizen.

Defendant was recalled and testified that he had received a five-year suspended sentence in Altus, Oklahoma for the offense of forgery, which was revoked, and he served one-third of the five-year sentence.

Clarence Bartlett was called in rebuttal and testified that he was a police officer in Wynnewood, and was acting in that capacity on the evening of January 4, 1971. He testified that he went to the scene and observed Bill Turner lying face-down on the floor. He testified that Turner's gun was still in the holster.

 Defendant's first proposition is two-fold. He first argues that the trial court committed error in refusing to grant a new trial on the grounds of newly discovered evidence. We have examined the affidavit of Mildred Hennessey and the stipulation by the parties as to the testimony of Mrs. Billl Turner presented to the trial court at the motion for new trial, and are of the opinion that the trial court properly denied the same. Mildred Hennessey's affidavit reflected the following: that Bill Turner came to her cafe every

Saturday and Sunday night since he started working for the police department; that shortly after arriving he would make a telephone call and within fifteen or thirty minutes, Nadine Rushing would appear; that most people in Wynnewood knew of the relationship between Turner and Nadine Rushing; that Turner told her on several occasions that he was off duty after 6:00 o'clock, and that he seldom had his gun on when he came to her place after 6:00 o'clock; that after the shooting Nadine Rushing came running out of the back room and was the only one who was crying; that the defendant, after the shooting, stated, "If I hadn't of shot him, he would have shot me." The stipulation of the parties after the testimony of Mrs. Bill Turner presented to the trial court reflected that on the evening in question, the deceased changed clothes at home, taking off his uniform jacket and putting on a brown coat. He advised his wife that he was going to return to the cafe on business, and approximately eight minutes later he was shot. In Taylor v. State, Okl.Cr., 286 P.2d 730, we stated in the first two syllabi:

"1. In determining whether a motion for new trial on the ground of newly discovered evidence should be sustained, the trial court should consider these questions: 1. Is the evidence material? 2. Did the accused or his counsel exercise due diligence to discover the evidence before the trial? 3. Is it cumulative? 4. Is there a reasonable probability that if the newly discovered evidence had been introduced at the trial, it would have changed the result?

"2. The granting of a motion for new trial on the ground of newly discovered evidence is addressed to the sound discretion of the trial court."

We need only to observe that in applying the guidelines set forth in *Taylor*, supra, to the affidavit of Mildred Hennessey and the stipulation of the parties as to testimony of Mrs. Turner, that the trial court did not abuse its discretion in denying the motion for a new trial.

■ Defendant next argues that the prosecuting attorney made an assertion in his opening statement that was not borne out by the testimony and, as such, was prejudicial and grossly harmful to the defendant. The assistant prosecuting attorney stated: "That Officer Turner, the deceased officer, was an officer and was investigating for the police department when he was down at this place." (Tr. 4) The early case of Scott v. State, 59 Okl.Cr. 231, 57 P.2d 639, stated in the Third Syllabus of the Court:

"Ordinarily, error cannot be predicated upon the opening statement of a prosecuting attorney to the jury, specifically stating what facts he expects to develop in testimony, where later, for some reason, he fails to introduce evidence to support some of the narrative related in the opening statement, unless such unsupported portions of the opening statement were made in bad faith and were manifestly prejudicial."

The prosecuting attorney in the instant case stated in his opening statement that the Wynnewood chief of police would testify "that Officer Turner was investigating for the police department when he was down at this place." On direct examination, Chief Holmes testified that Officer Turner was "on duty" at about 8:30 or 9:00 o'clock on the evening in question. He further testified on cross examination as follows:

"Q. Was that just this particular night, Mr. Holmes, or is that his regularly assigned duties, to patrol over there?

"A. This was his assigned duty, sir.

"Q. This was his assigned duty?

"A. Yes, sir.

"Q. And then he would be on official duty?

"A. Yes, sir."

Considering the police chief's subsequent testimony, we cannot hold that the prosecuting attorney's remarks were made in

bad faith. We, therefore, find this proposition to be without merit.

■ The next proposition contends "The State of Oklahoma committed error in persisting with incompetent, improper, and prejudical cross examination of the defendant which was designed to arouse and prejudice the jury." We have carefully examined each of the alleged improper questions by the prosecuting attorney, and although this question has not been properly preserved in that the defendant did not object to the questions, we are of the opinion that the proposition does contain merit. A sampling of the cross examination is as follows:

"Q. Well, when did you kill the officer? (Tr. 187)

" * * *

"Q. You brought the gun into *our county*? (Tr. 190) (Emphasis Added)

" * * *

"Q. This is your gun, isn't it? At that time you had it, back in January, didn't you? Go ahead. Show me how you killed *our officer*. Show us how you killed *our* officer, will you? (Tr. 191) (Emphasis Added)

" * * *

"Q. Have you ever written his widow?

" * * *

"Q. Have you ever written young Willie Turner's widow to tell her you're sorry you killed him?" (Tr. 191)

" * * *

"Q. His widow, you have written her, have you?"

In Harvell v. State, Okl.Cr., 479 P.2d 586, we quoted from the Fifth Syllabus of Johnson v. State, 95 Okl.Cr. 1, 237 P.2d 909, as follows:

" 'Where the guilt of the defendant is clear and there is no reason to believe that the jury could arrive at any other verdict but guilty the court will not reverse a case because of improper conduct of the county attorney.' "

The next proposition contends that the prosecuting attorney improperly expressed his opinion of defendant's guilt to the jury. We have carefully examined the closing argument of the state, and observe that the prosecuting attorney's statements were not expressions of his individual opinion, but rather, his conclusions based upon the evidence. See Music v. State, Okl.Cr., 396 P.2d 894.

■ The next proposition asserts "that the defendant's court appointed attorney committed irreparable harm toward the defendant when in his closing argument he made reference to 'niggers' and subsequently to their lack of morality." Defendant does not contend that he had incompetent counsel, but rather that his attorney's remarks in his closing statement were most grievous to the defendant. Defendant's attorney stated in his closing argument "I don't know if any of you people ever had, worked with niggers or worked niggers in your home, or on your farms, or anything. Have you? * * * I am sure that you all have heard' it, I know I have; and I'm sure you have to, that they're, well, let's say that they are immoral like." (Tr. 244–245) We observe that the defendant's attorney prefaced the alleged improper remark by the following:

"Now with Mr. Rennie telling you that all these witnesses were good citizens that volunteered to come up here—there wasn't a one of them that volunteered to come up here. Every one of them was served with a subpoena, an order, if you please, to be here and testify in this case. And then they all went in there the minute they got through testifying, ran in there to get their money from the Court Clerk's office, to get their money for coming here; so let's be fair about this. Let's be fair about this. If we are going to argue the case, let's argue the facts; and if I get out of the testimony, don't follow me, just forget what I was saying anytime I don't stay within the record of this case.

Now let's go back to what actually happened. I don't know if any of you people ever had * * *" (Tr. 244)

It is apparent from the Transcript that the majority of the state's witnesses, the defendant, and the deceased were of African descent. Although this Court does not condone the term used by the defense counsel, it is apparent that his trial tactics were such that he was attacking the credibility of the state's witnesses, and attempting, in view of the overwhelming evidence of the defendant's guilt, to save his client from the electric chair. In dealing with a similar proposition in Johnson v. State, Okl.Cr., 476 P.2d 395, we stated:

"Defendant further cites as error that the judgment and sentence was rendered through passion and prejudice of the jury because of the inflammatory remarks of the witness Sheldon in identifying the defendant as 'The nigger. The second man.' Defendant argues that this remark violates his civil rights, which is a matter beyond our consideration as we are concerned with the validity of his criminal conviction. Granting that the term used by the witness was improper, we cannot hold as a matter of law that it so inflamed the jury as to render a judgment unsupported by the evidence."

We, therefore, find this proposition to be without merit.

■ The next proposition contends that the "State of Oklahoma erred in its appeal for the death penalty in the closing argument when it blatantly and openly questioned whether or not an execution would actually be carried out, but conjectured with the jury that actual execution was problematical." The prosecuting attorney, in his closing statement, stated:

"I don't know what in your minds would be a proper case but I've listened to this evidence for a day and a half now and I don't know what more facts, what more text-book type of evidence it would take to justify a punishment of imposing the death penalty. *Now, whether he'll ever get it or not,* more importantly, I think the honest, law-abiding citizen has got to take a stand somewhere and this is the place to do it." (Tr. 258) (Emphasis Added)

He further stated:

"Well, I suggest to you that if there was ever a proper case, if you could conjure up a set of facts that would more justify imposing the death penalty, I don't know what you would add. I just don't know what you would add. Like I say, *whether he ever gets it or not,* it's important to start somewhere, it's important to tell officers everywhere, to tell the other officers * * *" (Tr. 260) (Emphasis Added)

Although the defendant did not timely object to these statements, we are of the opinion that the same are improper. As defendant's attorney succinctly states in his brief:

"There cannot possibly help but be conjecture that the argument of the Assistant District Attorney in the immediate case influenced the jury into giving George Walter Stevenson a greater punishment than it might have given had the instructions of the court been strictly followed, and had the prosecutor not extended his remarks beyond the plain statement of law applicable to the case."

In conclusion, we observe that the evidence of defendant's guilt is overwhelming. We are of the opinion that because of the errors previously discussed, justice would best be served by modifying the judgment and sentence from Death to Life Imprisonment, and as so modified, the judgment and sentence is affirmed. Modified and affirmed.